# IN THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY, MARYLAND

| | |
|---|---|
| **KRISTIN SIMMONS**<br>3300 Mills Crossing Place<br>Kensington, Maryland 20895 | *<br>*<br>* |
| **Plaintiff,** | * |
| v. | * **Civil Action No.** |
| **UM CAPITAL REGION HEALTH, Inc.**<br>250 W. Pratt Street, 24th Floor<br>Baltimore, MD 21201 | *<br>* |
| Serve: Resident Agent, Mary Elizabeth Zorzi<br>University of Maryland Medical System Corp.<br>250 West Pratt Street, 24th Floor<br>Baltimore, Maryland 21201 | *<br>* |
| **DIMENSIONS HEALTH CORPORATION d/b/a**<br>UM Capital Region Health, Inc.<br>3001 Hospital Drive<br>Cheverly, Maryland 20785 | *<br>*<br>* |
| Serve: Resident Agent:<br>University of Maryland Medical Sys. Corp.<br>Office of the General Counsel<br>24th Floor, 250 West Pratt Street<br>Baltimore, Maryland 21201 | *<br>*<br>* |
| **Defendants.** | |

*******************************************************************

## COMPLAINT AND ELECTION FOR JURY TRIAL

Now comes, Kristin Simmons ("Ms. Simmons"), by and through counsel, and sues the Defendants, UM Capital Region Health, Inc., and Dimensions Health Corporation d/b/a UM Capital Region Health (collectively "Capital Health"), and in support thereof states as follows:

## PARTIES

1. The Plaintiff, Kristin Simmons, is an adult citizen of Maryland, and the United States, residing at 3300 Mills Crossing Place, Kensington, Maryland. At all times relevant hereto, Plaintiff was employed as an infection preventionist at UM Capital Region Health, Inc. in Prince George's County, Maryland. Ms. Simmons is an individual entitled to protection under Americans with Disabilities Act (ADA), 42 U.S.C. § 12112(a) and § 12203(a), as amended by the Americans with Disabilities Amendments Act (ADAAA). Plaintiff's claims also arise under Title 31 U.S.C. Section 3730(h).

2. The Defendant, UM Capital Region Health, Inc. ("Capital Health") organized and existing under the laws of the State of Maryland, has a corporate headquarters at 250 West Pratt Street, Baltimore, Maryland and regularly does business at Dimensions Health Corporation (UMPG Hospital Center) located at 3001 Hospital Drive, Cheverly, Maryland, Prince George's County where the Plaintiff was employed. At all times relevant hereto, Defendant maintained offices, did business, and employed workers, including Plaintiff, at UM Prince George's Hospital Center, Maryland location.

3. The Defendant, Dimensions Health Corporation, is organized and existing under the laws of the state of Maryland, and has a corporate headquarters at 3001 Hospital Drive, Cheverly, Maryland, Prince George's County. At all times relevant hereto, Defendant Dimensions Health Corporation owned, operated and did business as UM Capital Region Health, Inc. at the 3001 Hospital Drive, Cheverly Maryland location. Collectively, Dimensions Health Corporation and UM Capital Regional Health, Inc. shall be referred to as "Capital Health".

## JURIDICTION

4. This Court has concurrent jurisdiction over this action under 42 U.S.C.§ 1981 over Plaintiff's claims arising under Americans with Disabilities Act (ADA), 42

U.S.C. § 12112(a) and § 12203(a), as amended by the Americans with Disabilities Amendments Act (ADAAA). In addition, Plaintiff's claims arise under Maryland common law and Title 31 U.S.C. Section 3730(h).

5.  Venue and personal jurisdiction are proper in the Circuit Court for Prince George's County, as it is the County in which Defendants regularly conduct business, and is a County in which Plaintiff provided employment services to Defendants.

6.  Plaintiff's claims exceed the minimum jurisdictional amount of $75,000.00.

7.  The unlawful employment practices described herein were committed within the State of Maryland, in Defendants' offices in Prince George's County, Maryland. Accordingly, venue is proper in the Circuit Court for Prince George's County.

8.  Plaintiff has exhausted her administrative remedies with the EEOC where her charge has been pending over 180 days and received Notice of her right to bring suit on February 9, 2021. As such, this suit is timely filed within the 90 days of receiving notice of the EEOC Notice of Right to Sue letter, and she has met all jurisdictional prerequisites to bringing this action. Defendant is an employer as defined under each respective statute.

## FACTS COMMON TO ALL COUNTS

The Plaintiff incorporates, repeats, realleges, adopts and incorporates by reference, paragraphs 1 through 8 above as though fully set forth herein.

9.  Plaintiff was hired as an Infection Control Practitioner to work at Capital Health beginning on September 18, 2017. She was responsible for monitoring infection rates at the facility known as Prince George's Hospital Center.

10. Plaintiff was diagnosed with a permanent neuromuscular disorder, fascioscapulohumeral muscular dystrophy (FSHD or FSHMD) that causes flares of pain and fatigue due to imbalance of muscle atrophy. This medical disorder causes laxity and lack of function in several muscles, including in Plaintiff's face. This medical disability impairs one or more of her major life functions, including working and motor skills, such that she is disabled under ADA and ADAAA.

11. Plaintiff's supervisor at Capital Health, Yeo-Jin Lee, expressed her dislike of Plaintiff based on the symptoms of the Plaintiff's neuromuscular medical condition, one symptom of which makes her passive neutral face less pleasant and which can be interpreted to be negative, as it is more difficult for Plaintiff to smile due to laxity in her facial muscles.

12. On November 17, 2017, Supervisor Lee told Plaintiff that her "attitude was unacceptable" because she did not smile at her supervisor in hallways, and "looked" disengaged, disinterested, or aggressive in meetings.

13. Plaintiff spoke to Laura Louis-Fils, the Human Resources (HR) Manager of Employee Relations about this negative comment on November 20, 2017, and disclosed her disability and was concerned that her disability was the reason for Ms. Lee's criticism, i.e., that Plaintiff did not smile and her face did not "look" like she was interested.

14. Thereafter, Supervisor Lee was continually negative and critical of Plaintiff and often gave contradictory directions. For instance, Ms. Lee would ask

Plaintiff to do a specific assignment, and then would later deny that she had asked Plaintiff to do it and criticize her for doing it.

15. Co-workers also noticed that Ms. Lee was treating Plaintiff differently, often ignoring suggestions made by Ms. Simmons but accepting the same suggestion when stated by a co-worker. The happened repeatedly and was clearly so intentional that it was noticed by Plaintiff's coworkers.

16. On or about March 2, 2018, Ms. Lee told Plaintiff that Plaintiff's face was offensive to her. Specifically, Plaintiff was invited to a meeting with Ms. Lee and her manager, Ingrid Connerney, to discuss how to streamline the department's work in the absence of a coworker. In the midst of a discussion about work assignments, Ms. Connerney interjected that Plaintiff's face and intonation were offensive to her, that Plaintiff's body language was unfriendly and that it "makes her uncomfortable."

17. At this point, despite Plaintiff's wishes to keep knowledge of her disability between herself and Human Resources, Plaintiff thought it necessary to disclose to both Ms. Lee and Ms. Connerney the nature of the physical limitations FSHD causes to prevent further insults about her personal appearance and body over which Plaintiff has only limited control. Plaintiff explained that as a result of her condition, her facial muscles are weakened and less controlled, making it difficult to maintain a "pleasant" passive face, which is why her face sometimes seems expressionless or not "smiley".

**18.** Both Ms. Lee and Ms. Connerney expressed understanding, at the time. They stated at this meeting that Plaintiff's work was impeccable, so the only complaint they had with Plaintiff was their perception of Plaintiff's attitude based on facial expressions, or lack thereof, that are outside of Plaintiff's control.

**19.** Thereafter, Plaintiff noticed that Ms. Lee carried a notebook with "Kristin Simmons" printed on the front. Supervisor Lee did not carry similar notebooks for other employees.

**20.** Ms. Lee also gave Plaintiff assignments with unrealistic deadlines, on short notice, and then would criticize her for not meeting the deadlines.

**21.** Ms. Lee started calling Plaintiff out in department meetings in front of other employees, specifically asking her whether she had a reaction to what she was saying because she could not tell how she "felt" about what was being said.

**22.** Ms. Lee continued to ignore Plaintiff's input and suggestions in team meetings which was obvious to other employees so much so that other employees volunteered to pass off Plaintiff's ideas as their own so that they could accomplish what was necessary for the entire team.

**23.** Plaintiff told Human Resources about Ms. Lee's and Ms. Connerney's negative comments about Plaintiff's face and lack of expression in an oral complaint to HR on March 22, 2018 and met with HR representatives to discuss disability-related concerns on March 30, 2018.

**24.** Because of the physical demands of the job and stress caused by the intimidating harassment by her supervisor, Plaintiff's symptoms worsened. Plaintiff

made formal requests for accommodation and presented doctor's notes in support of accommodation requests.

25. On April 20, 2018, Plaintiff requested a sit-stand desk as an accommodation and received a manual sit-stand desk.

26. On May 17, 2018, Plaintiff requested that she be provided an electric sit-stand desk because her impairment makes it difficult and painful to raise and lower a desk manually. Capital Health approved the request for an electric sit-stand desk.

27. Despite these accommodations, Plaintiff continued to be targeted by her supervisor leading to increasing stress from difficult interactions which exacerbated her symptoms. Plaintiff requested that there be a third person present when she had to meet with Ms. Lee about work matters, and that Ms. Lee send Plaintiff summary emails recapping assignments and the information given during the one-to-one meetings so that sudden deadlines and unrealistic expectations would stop occurring.

28. Plaintiff believed having a record of assignments would prevent Ms. Lee from claiming she had given Plaintiff directions when she had not, and from changing the nature of the tasks she assigned to Plaintiff without warning. On May 3, 2018, Capital Health denied this request.

29. Eventually, Plaintiff was granted the accommodation of having someone from HR present during Plaintiff's work meetings with Ms. Lee.

**30.** At the end of September 2018, at a formal performance review, Ms. Lee rated Plaintiff as meeting expectations in all performance metrics.

**31.** On November 28, 2018, Plaintiff had a one-to-one meeting with Ms. Lee that was also attended by HR. Ms. Lee criticized Plaintiff for not having completed two assignments—updating the Isolation Policy and updating the Management of Multi-Drug Resistant Organisms (MDROs) Policy—in time for the November Infection Prevention meeting. However, Plaintiff had told her on November 26 that the policies would not be ready for the meeting on November 28, and Ms. Lee said she understood.

**32.** At the November 28, 2018 meeting, Ms. Lee tried to criticize Plaintiff for the timing of the preparation of these policies. In response, Plaintiff stated that she had not been given a deadline for completion of the policies and she did not have time to have them prepared on short notice. The HR representative present at the one-to-one meeting, Veronica Ford, told Ms. Lee that she needed to set and communicate specific deadlines for work projects which would enable Plaintiff to prioritize her work.

**33.** Ms. Lee never met with Plaintiff again. Ms. Lee continued having one-to-one meetings each month with other employees but failed to schedule any more meetings with Plaintiff.

**34.** UM Prince George's Hospital needed additional ICU beds, but could not construct new ones. Its' solution was to divert overflow patients requiring ICU-

level care to their post-anesthesia care unit (PACU), which is located in a completely separate area from the ICU.

35. On or about December 28, 2018, Ms. Lee asked Plaintiff to determine how Capital Health could count post-anesthesia care unit (PACU) beds located on a different floor from the intensive care unit (ICU) as part of the ICU beds. By adding these beds into the numbers for the ICU beds, it would skew numbers reported and presumably improve infection control numbers that are published to Medicare, Medicaid and other health care organizations.

36. In particular, under NHSN guidelines, the number of observed infections is divided by the number of expected infections to yield the standardized infection ratio (SIR). The Center for Medicare and Medicaid Services utilizes the SIR to compare a hospital's performance to national benchmarks to make decisions on reimbursement rates and/or penalties attributed to the hospital. Making this number look more favorable would cause Medicare to believe that the unit was performing better than it actually was performing.

37. The National Healthcare Safety Network separates units by their physical location so it is inappropriate to add PACU beds to the ICU beds under the NHSN guidelines. Plaintiff knew that it would be inappropriate to lump the two areas together and told Ms. Lee she did not believe it was appropriate. Nonetheless, Ms. Lee insisted that she thought it could be done and dismissed Plaintiff's objections.

**38.** Plaintiff sought confirmation from NHSN that it would be inappropriate to count PACU beds with ICU beds that were located in a different area regardless of how they were being used at the time.

**39.** According to the Center for Disease Control: Ensuring data accuracy is critically important to both the Centers for Disease Control and Prevention (CDC) and the Centers for Medicare and Medicaid Services (CMS) for guiding prevention priorities and protecting patients. CDC and CMS require that all infections that meet the specified NHSN criteria and that CMS requires for incentive payment or public reporting purposes be reported to NHSN.

**40.** Repercussions of failing to follow the NHSN rules could result in serious allegations against the employer, and termination of employees. As such, Plaintiff felt that she needed to make sure NHSN rules were followed as they are the standard in the industry and required of health care organization receiving Medicare dollars by the CDC and CMS.

**41.** Ms. Lee continued to suggest that she was going to simply add the PACU numbers into the ICU. Ms. Lee continued to suggest that Plaintiff could not read and understand the NHSN guidelines. Plaintiff refused to submit falsified numbers.

**42.** At a team meeting on January 10, 2019, Ms. Lee again insisted that the PACU data be added into the ICU data. Plaintiff again objected. Nonetheless, pressure to calculate the PACU beds with the ICU beds continued.

43. Plaintiff explained at a meeting on January 14, 2019, that Ms. Lee's proposed counting method would violate NHSN guidelines, and that Plaintiff had obtained confirmation directly from NHSN that it was not permitted by NHSN guidelines.

44. Plaintiff informed Ms. Lee that she had confirmed her understanding of the guidelines with NHSN and that the PACU beds could not be counted together with ICU beds, at which point Ms. Lee lost her temper.

45. Ms. Lee fired Plaintiff on February 19, 2019.

46. Neither Ms. Lee nor anyone else at Capital Health gave Plaintiff any explanation for her termination. Plaintiff had no prior warnings or discipline.

47. Plaintiff's termination violates Capital Health policies requiring that notice or warning be given prior to firing an employee.

48. There was no legitimate cause for Plaintiff's termination.

49. Plaintiff was fired because Ms. Lee did not like Plaintiff due to her disability; and/or because she resented having someone from HR present to monitor her 1-1 meetings with Plaintiff; and/or because Plaintiff refused to participate in activities that would result in the reporting of inaccurate infection rates to CMS.

## Count I
### Americans with Disabilities Act (ADA), 42 U.S.C. § 12112(a) and § 12203(a), as amended by the Americans with Disabilities Amendments Act (ADAAA)

Plaintiff incorporates paragraphs 1 through 49 as though repeated herein in full.

50. At all times pertinent hereto, Ms. Simmons was employed by Capital Health.

51. Ms. Simmons had a physical disability as contemplated under the ADA and ADAAA as her disability effected major life functions, including her ability work and motor skills.

52. Ms. Simmons was a qualified individual, performing the essential functions of her job with and without reasonable accommodation.

53. Defendants were aware that Ms. Simmons had a disability and continued to harass and intimidate Ms. Simmons for her disability.

54. Defendant Capital Health, by and through its employees, took an employment action adverse to Plaintiff and discriminated against her because of her disability when demanding that she change her face and body because they were "offensive."

55. Defendants, by and through its employees, took an employment action adverse to Plaintiff and discriminating against Plaintiff because of her disability by refusing to let her meaningfully participate in meetings after learning of her disability.

**56.** Defendant Capital Health took an employment action adverse to Ms. Simmons and discriminating against her because of her disability by terminating Ms. Simmons on February 19, 2019.

**57.** Defendant Capital Health took all of the above discriminatory actions willfully and in violation of the ADA and ADAAA.

**58.** Capital Health took action that interfered with Ms. Simmons' right for reasonable accommodations and retaliated against her for exercising that right.

**59.** An employer who violates the ADA and ADAAA shall be liable for damages equal to any wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation, prejudgment interest, an additional amount as liquidated damages equal to the sum of the foregoing, equitable relief as may be appropriate, including employment, reinstatement, and promotion, and reasonable attorney's fees.

60. There is a causal connection between the request for accommodation (protected activity) and the adverse employment action that has resulted in damages, including loss of pay, loss of benefits, and loss of employment.

## COUNT II
## (Wrongful Termination)

Plaintiff incorporates paragraph 1 through 60 as though fully repeated herein in full.

**61.** Defendant Capital Health, by and through its employees, took an employment action adverse to Plaintiff demanding that she change her face and body because they were "offensive."

**62.** Defendant Capital Health, by and through its employees, took an employment action adverse to Plaintiff by refusing to let her meaningfully participate in meetings after learning of her disability.

**63.** Defendant Capital Health, repeatedly demanded that Plaintiff do something, ie. perform and submit inaccurate calculations, that she knew would be adverse to the guidelines of NHSN which she was legally required to follow.

**64.** Defendant Capital Health repeatedly demanded that Plaintiff violate NHSN guidelines, which action could potentially result in Medicare and Medicaid fraud.

**65.** Defendant Capital Health took an employment action adverse to Ms. Simmons by terminating Ms. Simmons on February 19, 2019 because of her requests for accommodations for a disability.

66. Defendant Capital Health terminated Plaintiff when she engaged in protected activity, speaking out and refusing to participate in activities that would result in the reporting of inaccurate infection rates to CMS.

67. There is a causal connection between Plaintiff's protected activity and Plaintiff's termination.

## Count III
### (Retaliation under False Claim Act)
Title 31 U.S.C. Section 3730(h)

Plaintiff incorporates paragraph 1 through 67 as though fully repeated herein in full.

68. Title 31 U.S.C. Section 3730(h) prohibits retaliatory actions against any employee, former employee, contractor, or agent who takes lawful actions in furtherance of a False Claims Act.

69. Plaintiff repeatedly informed Capital Health that miscounting the ICU beds at the Prince George's Hospital Center would be in violation of CDC and NHSN guidelines.

70. Defendant, Capital Health, repeatedly demanded that Plaintiff do something, ie. perform and submit inaccurate calculations, that she reasonably believed or knew would be in violation of the guidelines of NHSN which she was legally required to follow.

71. Defendant Capital Health repeatedly demanded that Plaintiff violate NHSN guidelines, which would result in Medicare and Medicaid fraud.

72. Defendant Capital Health took an employment action adverse to Ms. Simmons by terminating Ms. Simmons on February 19, 2019 because of her disagreement with her supervisor and refusal to perform and submit inaccurate calculations in violation of the NHSN guidelines.

73. Defendant Capital Health terminated Plaintiff when she engaged in protected activity, speaking out and refusing to participate in activities that would result in the reporting of inaccurate infection rates to Centers for Medicare and Medicaid Services.

74. There is a causal connection between Plaintiff's protected activity and Plaintiff's termination. The "bed counting controversy" was an explanation for Plaintiff's termination by Capital Health which was disclosed well after her termination occurred.

WHEREFORE, Plaintiff Simmons, prays this Honorable Court, award judgment against Defendant Capital Health as follows:

A. For a money judgment representing compensatory damages in an amount exceeding $75,000, including lost wages, past and future wages, all other sums of money, including any and all benefits and any other employment benefits together with interest on said amounts, in addition to tort damages;

B. For money judgment representing punitive damages for defendant's willful violations of law;

C. For money judgment representing prejudgment interest, if applicable;

D. Reinstatement and restoration of benefits;

E. That this Court retain jurisdiction over this action until defendant has fully complied with the orders of this Court;

F. For lost monies and damages pertaining to out-of-pocket expenses plus interest;

    G.    For costs of suit, including an award of reasonable attorney's fees, expert fees; and,

    H.    For such other and further relief as may be just and proper.

### Prayer for Jury Trial

Plaintiff, Kristin Simmons, respectfully requests a trial by jury on all claims.

Respectfully Submitted,

_/s/ Ellen B. Flynn_

Ellen B. Flynn, Esquire
(CPF#9706250138)
Ellen.Flynn@smitheylaw.com
Smithey Law Group, LLC
706 Giddings Avenue, Suite 200
Annapolis, Maryland 21401
410-919-2990
443-875-7303 (cell)

Attorneys for Plaintiff, Kristin Simmons