IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| KRISTIN SIMMONS, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. 8:21-002074-PX |
| UM CAPITAL REGION HEALTH, INC., *et al.*, | * | |
| | * | |
| Defendant. | | |

******

## MEMORANDUM OPINION

Pending before the Court is the partial motion to dismiss filed by Defendant UM Capital Region Health, Inc. and its affiliate, Dimensions Health Corporation (collectively, "Capital Health" or "Defendant").[1]  ECF No. 8.  The matter is fully briefed, and no hearing is necessary. *See* D. Md. Loc. R. 105.6.  For the following reasons, the Court GRANTS the motion.

**I.      Background[2]**

Plaintiff Kristin Simmons ("Simmons") worked as an Infection Control Practitioner at Capital Health from September 18, 2017, to February 19, 2019.  In that position, Simmons

---

[1] It appears that Dimensions Health Corporation does business as UM Capital Region Health.  *See* ECF No. 5 ¶¶ 2–3 ("Defendant Dimensions Health Corporation owned, operated, and did business as UM Capital Region Health"); *Simmons v. UM Capital Region Health, Inc., et. al.*, Civil Case No. CAL21-05005 (Cir. Ct. Prince George Cty.)**,** Maryland Judiciary Case Search, https://casesearch.courts.state.md.us/casesearch/inquiryByCaseNum.jis (under "Search By Case Number," select "Prince George's County Circuit Court" and enter case number "CAL21-05005") (last visited Oct. 13, 2021) (affidavit of service certifying service on "Dimensions Health Corporation d/b/a UM Capital Region Health, Inc."); *see also  Our History*, University of Maryland Capital Region Health, https://www.umms.org/capital/about/history (last visited Oct. 13, 2021) (stating that UM Capital Region Health was formerly named Dimensions Health).  A corporation doing business under another name does not create a separate entity.  *See*, *e.g.*, *Snowden v. CheckPoint Check Cashing*, 290 F.3d 631, 643 n.2 (4th Cir. 2002) (citations omitted).  Accordingly, the Court refers to UM Capital Region Health and Dimensions Health Corporation collectively as "Defendant" because they are one and the same.

[2] The Court accepts as true and most favorably to Simmons the facts alleged in the Complaint.  *See Mylan Lab'ys, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993) ("In considering a motion to dismiss, the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff.") (citing *De Sole v. United States*, 947 F.2d 1169, 1171 (4th Cir. 1991)).

monitored infection rates for patients at Prince George's Hospital Center ("the Hospital").  ECF No. 5 ¶¶ 9, 45.  Simmons reported directly to Yeo-Jin Lee ("Lee"), with whom she had a fractured and tense relationship.  *Id.* ¶¶ 11, 14–20.

It is undisputed Simmons suffers from facioscapulohumeral muscular dystrophy ("FSHD"), a neuromuscular disorder that causes muscle laxity, pain, and fatigue throughout her body.  ECF No. 5 ¶ 10.  For Simmons, FSHD makes it difficult, if not impossible, for her to control the muscles in her face, leaving her with a flat affect and inability to smile or register other human emotions.  *Id.* ¶¶ 10–11.  In short, FSHD adversely impacts Simmons' ability to engage with others nonverbally.

Lee failed to appreciate the gravity of Simmons' disability.  For example, on November 17, 2017, Lee told Simmons that she believed Simmons' "attitude was unacceptable" because of how Simmons failed to smile in the hallways and how she appeared "disinterested or disengaged" at staff meetings.  ECF No. 5 ¶ 12.  Simmons, in turn, discussed her disability with Human Resources Department ("HR") and conveyed that Lee had discriminated against her on account of her disability.  *Id.* 5 ¶ 13.

Nonetheless, Lee persisted.  During a staff meeting that took place on March 2, 2018, Lee interrupted Simmons to announce that Lee found Simmons' face and intonation "offensive" and told Simmons that this made Lee "uncomfortable."  ECF No. 5 ¶ 16.  Simmons thereafter told Lee about how FSHD prevented Simmons from controlling her facial expressions.  *Id.* ¶¶ 16–17.  Lee responded by ratcheting up her criticism of Simmons' performance.  Lee carried a notebook with Simmons' name printed on the front, singled her out during department meetings, and changed her assignments and deadlines without warning.  *Id.* ¶¶ 19–22.

On March 30, 2018, Simmons met with HR to discuss accommodations for her disability. Because of the "physical demands" of Simmons' position and the "stress caused by intimidating harassment" from Lee, Simmons noted that her FSHD had worsened.  She requested both a manual sit-stand desk and an electronic sit-stand desk, which Capital Health provided.  ECF No. 5 ¶¶ 24–26.  Further, to address what Simmons viewed as Lee's "targeting" behaviors, Simmons requested that a member of HR be present during meetings with Lee and that Lee be required to provide written summaries of their meetings and any assignments given to Simmons.  *Id.* ¶ 27. The purpose of this request was to maintain "a record" of Lee's adverse treatment and curtail Lee's ability to change assignments and deadlines on a whim.  *Id.* ¶ 28.

On May 3, 2018, Capital Health granted Simmons' request to have a member of HR present during meetings with Lee.  ECF No. 5 ¶¶ 27–28.  At the first and only meeting in which an HR member was present, Lee criticized Simmons for not completing an assignment in advance of the meeting.  When Simmons insisted that Lee had never set a deadline for the assignment, the HR representative instructed that Lee should communicate specific deadlines to Simmons.  No further meetings took place until Simmons was terminated on February 19, 2019. *Id.* ¶¶ 31–33.

Throughout Simmons' employment, she and Lee disagreed over the criteria used to count the number of Intensive Care Unit ("ICU") beds at the Hospital pursuant to the National Healthcare Safety Network ("NHSN") guidelines.  The NHSN guidelines proscribe how hospitals should count the number of beds in each unit for use in calculating the "standardized infection ratio" at the Hospital.  The Hospital reports this standardized infection ratio to the Center for Medicare and Medicaid Services, which, in turn, uses the ratio to "compare a

hospital's performance to national benchmarks to make decisions on reimbursement rates and/or penalties."  ECF No. 5 ¶¶ 35–37.

Simmons' and Lee's differences in this respect came to a head on December 28, 2018. Lee urged Simmons to count the overflow ICU beds located in the post-anesthesia care unit among the number of reportable ICU beds.  Simmons objected because she believed counting the overflow beds would violate NHSN guidelines.  Simmons also confirmed with NHSN that Lee's counting method would run contrary to the guidelines, and she told Lee as much.  ECF No. 5 ¶ 35.  Lee, in response, intimated that Simmons "could not read and understand the NHSN guidelines*."  Id.* ¶ 41.  When Simmons again refused to count the overflow ICU beds, Lee "lost her temper," and shortly thereafter, Simmons was fired.  *Id.* ¶¶ 43–45.

On May 11, 2021, Simmons filed this suit in Prince George's County Circuit Court against Defendant, alleging discrimination and denial of reasonable accommodation in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* (Count 1); wrongful termination under Maryland common law (Count 2); and retaliation in violation of the False Claims Act ("FCA"), 31 U.S.C. § 3730(h) (Count 3).  ECF No. 5 ¶ 4.  Simmons filed an affidavit of service on Defendant in the Circuit Court of Prince George's County on July 9, 2021.  *See Simmons v. UM Capital Region Health, Inc., et. al.*, Civil Case No. CAL21-05005 (Cir. Ct. Prince George Cty.), Maryland Judiciary Case Search, https://casesearch.courts.state.md.us/casesearch/inquiryByCaseNum.jis (under "Search By Case Number," select "Prince George's County Circuit Court" and enter case number "CAL21-05005") (last visited Oct. 13, 2021).  On August 16, 2021, Defendant noted removal to this Court. [3]  ECF No. 4.  Defendant next moved to dismiss the lion's share of the Complaint.

---

[3] Defendant also moved for permission to "late file" its notice of removal, claiming that "Dimensions" had not been formally served on July 9, 2021 through service on UM Capital Health, and that Dimensions only

## II.     Standard of Review

A motion to dismiss brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the sufficiency of the complaint.  *See Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (citation and internal quotation marks omitted).  A plaintiff need only satisfy Rule 8(a)'s requirement to provide a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The Court accepts "the well-pled allegations of the complaint as true," and construes all facts and reasonable inferences most favorably to the plaintiff.  *See Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).

A complaint's factual allegations "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555) ("[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do.").  The Court must be able to deduce "'more than the mere possibility of misconduct'"; the facts of the complaint, accepted as true, must demonstrate that the plaintiff is entitled to relief.  *See Ruffin v. Lockheed Martin Corp.*, 126 F. Supp. 3d 521, 526 (D. Md. 2015) (quoting *Iqbal*, 556 U.S. at 679).

---

"learned" of the action on August 16, 2021, the date the proof of service was filed in Circuit Court for Prince George's County.  ECF No. 4 ¶¶ 3–4.  This argument is transparently flawed.  Dimensions, "doing business as" UM Capital Health, is not "a separate legal entity capable of being sued."  *See Snowden*, 290 F.3d at 624 n.2 (citations omitted).  Accordingly, and as the Defendant essentially concedes, its notice of removal was filed 38 days after service of process was effectuated and was thus untimely.  *See* 28 U.S.C. § 1446(b).  That said, Simmons did not move to remand or otherwise challenge the removal, and so the Court cannot now remand the case for a procedural defect such as untimely removal.  *See Ellenburg v. Spartan Motors Chassis, Inc.*, 519 F.3d 192, 199 (4th Cir. 2008).  The case will remain in this Court, and ECF No. 4 will be denied as moot.

### III.      Discussion

### A.      ADA Failure to Accommodate (Count I)

Simmons combines two distinct liability theories in Count I—disability discrimination and denial of reasonable accommodations.  Defendant challenges only the latter claim, and so the discrimination claim will proceed.  The accommodation claim, however, must be dismissed.

The ADA requires a qualified employer to provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee."  42 U.S.C. § 12112(b)(5)(A).  "Disability" under the ADA is broadly defined as "a physical or mental impairment that substantially limits one or more major life activities of an individual."  *See* 42 U.S.C. § 12102(1).  To state a failure to accommodate claim, the plaintiff must plausibly aver that (1) she is an individual with a disability; (2) the employer had notice of her disability; (3) she could perform the essential functions of her position with reasonable accommodation; and (4) the employer refused to make such accommodations.  *See Rhoads v. F.D.I.C.*, 257 F.3d 373, 387 n.11 (4th Cir. 2001) (citing *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6 (2d Cir. 1999)).  At the pleading stage, the Complaint need do no more than make plausible the plaintiff had been denied a reasonable accommodation for her disability.  *Swierkiewicz v. Sorema*, 534 U.S. 506, 510 (2010).

The parties do not dispute that Simmons is disabled on account of her FSHD which causes a "laxity and lack of function in several muscles" and "pain and fatigue due to imbalance of muscle atrophy."  ECF No. 5 ¶ 10.  Nor does Capital Health dispute that it knew of her disability and, in fact, provided Simmons several reasonable accommodations in response.  ECF No. 5 ¶¶ 13, 16–17.

Instead, Capital Health maintains, essentially, that it gave Simmons everything that she requested. ECF No. 8 at 4. Simmons responds that Defendant's failure to provide written assignments and deadlines, as well as an HR representative at every meeting, forms the basis of a viable ADA claim. ECF No. 9-1 at 8. Because Simmons has failed to make plausible the connection between the challenged accommodations and her disability, the claim must be dismissed.

An employer's obligations under the ADA are triggered for those accommodations necessary for the plaintiff to perform the essential functions of her job. *Fierce v. Burwell*, 101 F. Supp. 3d 543, 550 (D. Md. 2015) (quoting *Gaines v. Runyon,* 107 F.3d 1171, 1175 (6th Cir. 1997)); *see also Mason v. Sun Recycling, LLC*, No. GLS-18-2060, 2020 WL 1151046, at *12 (D. Md. Mar. 9, 2020); *Hamel v. Bd. of Educ. of Hartford Cnty.*, No. JKB-16-2876, 2018 WL 1453335, at *12 (D. Md. Mar. 23, 2018). Stated differently, an employer's failure to provide an accommodation is only actionable if the accommodation would "alleviate disability-induced limitations that impact an employee's job-related activities." *Hamel*, 2018 WL 1453335, at *12. "A causal relationship" between the disability and the accommodation, therefore, is essential to the success of the claim. *Fierce*, 101 F. Supp. 3d at 550 (quoting *Gaines*, 107 F. Supp. at 550).

When viewing the Complaint as true and most favorably to Simmons, no facts establish the requisite causal connection. Nothing suggests, for example, that the requested accommodations would alleviate the physical or mental limitations caused by Simmons' FSHD such that she could perform her job as an Infection Control Practitioner. Rather, the Complaint expressly avers the opposite—that Simmons wanted an HR representative and assignments in writing to make a "record" of Lee's discriminatory acts and curtail the mistreatment. *E.g.,* ECF No. 5 ¶¶ 27–28 (request made to ensure that "sudden deadlines and unrealistic expectations

would stop occurring."); *see Hamel*, 2018 WL 1453335, at *13 (granting summary judgment on accommodations claim where "the driving force behind Plaintiff's request for accommodation was *Defendant's* alleged harassment").

Perhaps the Complaint comes closest in suggesting that Simmons asked for these accommodations, in part, to "reduce stress." ECF No. 5 ¶ 27. But as pleaded, this assertion proves too much. Every job visits a certain level of "stress" on employees which, in turn, could possibly aggravate preexisting conditions. This fact alone does not transform every stress-reducing request into a reasonable accommodation. The employee must still make plausible that the requested accommodation would alleviate some aspect of her disability-induced limitation before the denial of the accommodation is actionable under the ADA.

Because Simmons has failed to make plausible that the requested accommodations bear any relationship to her disability, the claim must be dismissed, albeit without prejudice. The Court will grant Simmons leave to amend the Complaint to make plausible the connection between the requested accommodation and alleviation of the limitations of her disability (as opposed to her desire to blunt Lee's discriminatory conduct). Simmons will be granted fourteen days from the date of this opinion and order to amend the Complaint to cure this defect, if possible.

### B.     Count II:  Wrongful Discharge

Defendant's next challenge the wrongful discharge claim, arguing that it is simply unavailable for an at-will employee like Simmons. Although it is true that an at-will employee may generally be discharged at any time and for any reason, a wrongful discharge claim may lie where an employee's discharge "contravenes some clear mandate of public policy." *Adler v. Am. Standard Corp.*, 291 Md. App. 31, 47 (1981); *see also Porterfield v. Mascari II, Inc.*, 374

Md. App. 402, 422–23 (2003).  To establish a claim for wrongful discharge in this context, the employee must plausibly allege that: (1) she was discharged; (2) the discharge violates a clear mandate of public policy; and (3) a nexus exists between the employee's protected conduct and her discharge.  *See Yuan v. Johns Hopkins Univ.*, 452 Md. App. 436, 451 (2017) (*Wholey v. Sears Roebuck*, 370 Md. App. 38, 50–51 (2002)).  The claim is limited to "remedying only those discharges in violation of a clear mandate of public policy which otherwise would not be vindicated by a civil remedy.'"  *Muench v. Alliant Foodservice, Inc.*, 205 F. Supp. 2d 498, 504 (D. Md. 2002) (quoting *Makovi v. Sherwin-Williams Co.*, 316 Md. App. 603, 605 (1989)).

The Complaint pursues two liability theories; (1) that Capital Health wrongfully terminated Simmons on account of her disability and (2) because she refused to calculate ICU beds in a manner that contravened NHSN guidelines.  ECF No. 5 ¶¶ 63–66.  Neither are availing. Challenges to Simmons' termination grounded in her disability are already covered in the broad remedial scheme of the ADA.  *See Chappell v. S. Md. Hosp. Inc*., 320 Md. App. 483, 491–93 (1990).  Where a plaintiff may pursue the civil statutory remedies for termination giving rise to an ADA claim, the plaintiff is precluded from pursuing a companion wrongful discharge cause of action.  *See, e.g.*, *Glynn v. EDO Corp*., 536 F. Supp. 2d 595, 616 (D. Md. 2008).

As to the second ground, Simmons' refusal to calculate the number of ICU beds in violation of NHSN guidelines, the Complaint fails to identify any unremedied mandate of public policy that has been violated.  At best, the averred facts reflect a heated dispute between Simmons and Lee as to how to properly calculate ICU beds.   This alone does not establish that Simmons' termination—even if stemming from this disagreement—violated a mandate of public policy.

Moreover, to the extent Simmons relies on the same conduct supporting her FCA retaliation claim, then the claim must fail because, like the ADA, the FCA provides the statutory remedy covering her alleged wrongful termination, and so recovery under common law wrongful discharge cannot be had in the "name of the same public policy interest." *See Glynn*, 536 F. Supp. at 616. Nor does Simmons cure this defect by pointing to the Maryland False Claims Act for the "mandate of public policy." This statute, too, provides its own remedial scheme for retaliatory discharge. *See* Maryland False Claims Act, Md. Code Ann., Health-Gen. § 2-607 (b) (West 2021) (providing civil right of action to individuals retaliated against for engaging in protected activity).

Accordingly, the Complaint fails to make plausible that Simmons' termination violated a public policy mandate for which no other legal remedy exists.[4] Nor can the Court conceive of any additional facts that would cure this pleading deficiency. Count II, therefore, must be dismissed with prejudice.

### C.      Count III:  FCA Retaliation

Capital Health lastly argues that the FCA retaliation claim fails because no facts make plausible that Simmons had engaged in "protected activity" giving rise to her termination. ECF No. 8-1 at 7. The FCA is designed to prevent fraud on the federal government. The statute imposes liability upon any person who "knowingly presents, or causes to be presented [to the government] a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or

---

[4] Simmons relies on *Insignia Residential Corp. v. Ashton*, 359 Md. App. 560 (2000), to support her assertion that a wrongful discharge action may be brought when the basis for the discharge is refusing to participate in illegal conduct. ECF No. 9 at 10–11. Simmons reads *Insignia* too broadly. The Court in *Insignia* upheld the availability of a wrongful discharge claim where the plaintiff was terminated for refusing to violate the *criminal* statute prohibiting prostitution. Because the criminal code did not afford plaintiff any remedy once she was discharged for refusing to violate it, the Maryland Court of Appeals concluded that a wrongful discharge claim could proceed. *Insignia*, 359 Md. at 573. Simmons, by contrast, retains ample statutory remedies under the ADA and FCA to pursue her theories of wrongful discharge.

causes to be made or used, a false record or statement" to receive payment from the government. *See* 31 U.S.C. § 3729(a).  An employee who opposes an FCA violation enjoys protection against the employer's retaliatory acts.  *See* 31 U.S.C. § 3730(h).[5]  To make plausible an FCA retaliation claim, the plaintiff must aver that she (1) engaged in protected activity; (2) her employer knew about the protected activity; and (3) the employer took adverse action against her as a result. *United States ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 200 (4th Cir. 2018).

"Protected activity" is defined as either acting "in furtherance of [an FCA action]" or making "efforts to stop an or more [FCA violations]."  31 U.S.C. § 3730(h)(1).  Simmons does not maintain that she was attempting to further an FCA cause of action, so the only conceivable protected activity would be based on her attempts to stop an FCA violation.  As to this theory, the Complaint must make plausible that the plaintiff was "motivated by an objectively reasonable belief that the employer is violating, or soon will violate, the FCA."  *Grant*, 912 F.3d at 201.  "A belief is objectively reasonable when the plaintiff alleges facts sufficient to show that [she] believed [her] employer was violating the FCA, that this belief was reasonable, that [she] took action based on that belief, and that [her] actions were designed to stop one or more violations of the FCA."  *Id.* at 201–2.  At a minimum, the plaintiff's actions must "have a nexus to an FCA violation."  *Id.* at 202.

With this standard in mind, the FCA retaliation claim fails to make plausible that Simmons was attempting to stop an FCA violation.  At best, Simmons objected to Lee's ICU bed-counting method as running afoul of NHSN guidelines.  ECF No. 5 ¶ 43, 49.  But no facts

---

[5] Section 3730(h)(1) provides that "[a]ny employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter."

support that Lee's preferred method gave rise to a potential FCA violation.  On this point, the Complaint avers no more than speculation—that Lee had urged impermissible counting of overflow beds so as to "*presumably* . . . improve infection control numbers that are published to Medicare, Medicaid and other health care organizations."  *Id.* ¶ 35 (emphasis added).  Such speculation does not nudge the claim from the possible to the plausible.  *See Iqbal,* 556 U.S. at 678.

Nor do the facts make reasonable any supposed belief on Simmons' part that her employer had been violating the FCA.  Simmons and Lee disagreed about how to interpret NHSN guidelines regarding ICU bed counting.  The disagreement does not support that Capital Health was attempting to fraudulently obtain government payments based on this bed count. ECF No. 5 ¶¶ 37, 41.  Voicing "concerns about regulatory non-compliance" alone does not make plausible that an employee reasonably believed her employer was violating the FCA.  *Cf. Grant*, 912 F.3d at 202 (finding employee had engaged in protected activity when he alleged "specific illegal, fraudulent conduct against the government" instead of mere regulatory non-compliance). *See also Potter v. CASA de Maryland*, No. PX-16-0475, 2018 WL 1183659, at *9 (D. Md. Mar. 6, 2018) ("Potter fails to allege facts from which the Court could infer that a reasonable employee in Potter's shoes *objectively* and reasonably could believe *an FCA* violation would occur.") (emphasis in original).  Thus, as pleaded, Simmons expressed disagreement over interpreting NHSN guidelines does not constitute "protected activity" under the FCA retaliation provision.

Alternatively, even assuming Simmons engaged in protected activity, the Complaint fails to allege plausibly that Capital Health was on notice of her protected activity.  As to this notice prong, the plaintiff must make plausible that her "words and acts" in opposing the FCA violation

"are sufficiently suggestive of fraud or falsity such that the employer knew or should have known that FCA litigation was a reasonable possibility." *Mason v. Netcom Techs., Inc.*, No. PWG-20-03558, 2021 WL 4286535, at *4 (D. Md. Sept. 21, 2021) (citing *Potter*, 2018 WL 1183659, at *8). Here, Simmons framed her objection to Lee's counting method as "inappropriate" or "adverse" to NHSN guidelines; she never said anything suggesting that this regulatory breach was fodder for committing an FCA violation. ECF No. 5 ¶¶ 37–38, 63. And although Simmons "refused to submit falsified numbers" generally, no facts shed light on when, where, or to whom she would be submitting such "falsified numbers" sufficient to put Defendant on notice that her refusal constitutes opposition to an FCA violation. Thus, Simmons' general objection to these numbers alone does not make plausible "that FCA litigation was a reasonable possibility." *Mason*, 2021 WL 4286535, at *4 (internal citation and quotations omitted).

In sum, the core of this claim, viewed most favorably to Simmons, amounts to a mere disagreement over the proper way to count ICU beds pursuant to pertinent regulatory guidelines. This does not make plausible an FCA retaliation cause of action. Nor can the Court see how Simmons could cure these pleading defects. Thus, Count III must be dismissed with prejudice.

## IV.   Conclusion

The Court grants Defendant's motion to dismiss Counts II and III with prejudice. The Court dismisses Simmons' failure to accommodate claim under the ADA (Count I) without prejudice. Plaintiff shall have fourteen days from the date of this Opinion and Order to amend her Complaint as to this claim. A separate order follows.


October 14, 2021                                 ___/s/_____

Date                                                     Paula Xinis
                                                              United States District Judge