IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| KRISTIN SIMMONS, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. 8:21-002074-PX |
| UM CAPITAL REGION HEALTH, INC., *et al.*, | * | |
| | * | |
| Defendant. | | |

******
**<u>MEMORANDUM OPINION</u>**

Pending before the Court is Plaintiff Kristin Simmons' motion for leave to file an amended complaint (ECF No. 14) and motion to alter or amend judgment and to file an amended complaint (ECF No. 16). The motions are fully briefed, and no hearing is necessary. *See* D. Md. Loc. R. 105.6. For the reasons stated below, the Court will grant Simmons leave to file an amended complaint and deny the motion to reconsider.

**I.     Background**

**A.  Factual Background**

Plaintiff Kristin Simmons worked as an Infection Control Practitioner for Defendant Dimensions Health Corporation, doing business as UM Capital Region Health, Inc. ("Capital Health") from September 18, 2017, to February 19, 2019. ECF No. 14-1 ¶¶ 7, 48. In this position, Simmons was responsible for monitoring infection rates for patients at Prince George's Hospital Center ("the Hospital"). *Id.* ¶ 7. Simmons reported directly to Yeo-Jin Lee, with whom she had a fractured and tense relationship. *Id.* ¶¶ 9, 12–25.

Simmons suffers from facioscapulohumeral muscular dystrophy ("FSHD"), a neuromuscular disorder that causes muscle laxity, pain, and fatigue throughout her body. ECF

No. 14-1 ¶ 8. For Simmons, FSHD makes it difficult, if not impossible, to control the muscles in her face, leaving her with a flat affect and inability to smile or register other human emotions. *Id*. In short, FSHD adversely impacts Simmons' ability to engage with others nonverbally.

Lee failed to appreciate the gravity of Simmons' disability. For example, on November 17, 2017, Lee told Simmons that she believed Simmons' "attitude was unacceptable" because of how Simmons failed to smile in the hallways and how she appeared "disinterested or disengaged" at staff meetings. ECF No. 14-1 ¶¶ 8–11. Simmons, in turn, disclosed her disability to the Human Resources Department ("HR") and conveyed her concerns about Lee's actions. *Id.*

Lee, however, continued to disparage Simmons about her face and voice intonation, prompting Simmons to disclose her disability to Lee. ECF No. 14-1 ¶¶ 14–15. Although Lee claimed to understand, she still singled out Simmons at department meetings and imposed unreasonable and ever-changing assignments on Simmons. *Id.* ¶¶ 19–20, 25. Consequently, Simmons met with HR on March 30, 2018, to address what Simmons viewed as Lee's "targeting" behaviors and ask that HR maintain a record of Lee's adverse treatment and curtail Lee's ability to change assignments and deadlines on a whim. *Id.* ¶¶ 25–26. Capital Health ultimately agreed, but only one meeting between Simmons and Lee took place before Simmons was fired in February 2019. *Id.* ¶¶ 27, 29–31.

Simmons and Lee also disagreed about certain reporting metrics to the National Healthcare Safety Network ("NHSN"). ECF No. 14-1 ¶¶ 33–34. The NHSN collects data from healthcare facilities to aid them in measuring quality and safety of care. *Id.* ¶¶ 78–81. The NHSN data is used directly by the Center for Medicare and Medicaid Services ("CMS"), the Centers for Disease Control and Prevention ("CDC"), and the Maryland Health Services Cost Review Commission ("HSCRC"). *Id.* ¶¶ 81–84.

In particular, NHSN uses the data collected to calculate a "standardized infection ratio," which measures how well a hospital prevents infections. ECF No. 14-1 ¶ 83–84. The standardized infection ratio is calculated by dividing the number of observed infections by the number of expected infections at a hospital. *Id.* ¶¶ 34, 78–85. Required for this calculation is the number of beds available at the hospital. *Id.* ¶¶ 33–34. NHSN has established guidelines for how healthcare workers should collect data, and the CDC, CMS, and the HSCRC each mandate that data be reported in accordance with the NHSN guidelines. *Id.* ¶¶ 34, 40, 82–85.

The HSCRC also uses these statistics to set the rates that Maryland hospitals may charge for its services as applied to all payors, including federal Medicare and Medicaid, as well as State healthcare plans. *Id.* ¶¶ 35–39, 87–88. HSCRC assigns each facility a Quality Based Reimbursement Score ("QBR score") that is based heavily on facility safety, which considers the standardized infection ratio. *Id.* ¶¶ 85–92. A favorable QBR score permits a facility to charge up to 2% more from all payors, including Medicare, Medicaid, and State healthcare plans. *Id.* By contrast, an unfavorable QBR score may result in a monetary penalty of up to 2% of its global budget in the upcoming fiscal year. *Id.*

Capital Health knew this reward and penalty system all too well. In the last reporting period before Simmons' termination, Capital Health's QBR score resulted in a 1.31% penalty, costing the organization $3,531,025.00. *Id.* ¶ 93. Likewise, Simmons was intimately familiar with this process and with Capital Health's prior QBR score, and so she took great pains to ensure she provided an accurate bedspace count to NHSN. *Id.* ¶ 43.

But Simmons and Lee sharply disagreed about how to count bedspaces for calculation of the QBR score. ECF No. 14-1 ¶¶ 35–50. Lee urged Simmons to count overflow ICU beds located in the post-anesthesia care unit ("PACU") among the number of reportable ICU beds. *Id.*

Simmons objected because she believed counting the overflow beds would violate NHSN guidelines, which required that each bed may be counted only if they were separated by physical location. *Id.* Simmons consulted with NHSN to confirm that she was right and reported to Lee that Lee's counting the PACU beds would run contrary to the guidelines. *Id.* Thus, asserts Simmons, had she followed Lee's instruction, she would have knowingly submitted falsified data to NHSN, which would, in turn, artificially boost the standardized infection ratio and QBR score, as well as the rates that the Hospital could charge Medicare, Medicaid, and state healthcare plans. *Id.* ¶¶ 33–50, 94–99. After Simmons repeatedly resisted Lee's directives, Lee "lost her temper," and shortly thereafter, Simmons was fired. *Id.* ¶¶ 47–49.

### B. Procedural History

On May 11, 2021, Simmons filed suit against Capital Health in the Prince George's County Circuit Court, alleging discrimination, retaliation, and failure to accommodate her disabilities in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*; wrongful termination under Maryland common law; and retaliation under the False Claims Act ("FCA"), 31 U.S.C. § 3730(h). ECF No. 1-3 ¶¶ 51–74. On August 16, 2021, Capital Health removed the case to this Court and moved to dismiss the claims. ECF Nos. 1, 8. The Court granted the motion, however it allowed Simmons to amend the Complaint to make plausible her ADA accommodations claims, if possible. ECF No. 11 at 13. The Court dismissed the wrongful termination and FCA claims with prejudice. *Id.*

Simmons subsequently moved for leave to amend the Complaint. ECF No. 14. In the proposed Amended Complaint, Simmons makes clear that she is pursuing an ADA discrimination and retaliation claim, and pleads each separately. *Id.* ¶ 3.[1] As to her FCA claim,

---

[1] The Court grants Simmons' unopposed request to plead the ADA claims in separate counts. ECF Nos. 14 ¶ 3 & 15 at 2 n.2.

she pleads a more robust factual predicate to support a retaliation claim but adds it only under the Maryland False Claims Act ("MFCA"), Md. Health–Gen. Code § 2-607.  ECF No. 14 ¶ 4. Capital Health opposes Simmons' request to add the MFCA claim.  ECF No. 15.

Simmons also moves separately for the Court to "reconsider" its prior dismissal of the federal FCA claim with prejudice in light of the additional facts pleaded in the proposed Amended Complaint.  ECF No. 16 ¶ 4.  The Court construes the motions together as seeking leave to amend her Complaint to pursue both the federal and state FCA retaliation claims. Because the proposed Amended Complaint includes sufficient facts to make plausible both FCA claims, leave to amend is granted, and the motion to reconsider is denied.

### III.  Analysis

The Court begins with the bedrock principle that leave to amend a complaint should be granted freely "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Liberal amendment ensures that federal courts resolve cases on their merits instead of technicalities.  *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006).  Permitting amendment appears especially appropriate when the defendant already had notice of the claim.  *See Davis v. Virginia Commonwealth Univ.*, 180 F.3d 626, 628 (4th Cir. 1999).  Indeed, amendment may even be granted where, as here, claims had been previously dismissed with prejudice, provided such amendment serves the ends of justice. *See Adbul-Mumit v. Alexandria Hyundai, LLC*, 896 F.3d 278, 293 (4th Cir. 2018).

Generally, courts deny amendment only where the non-movant demonstrates "prejudice, bad faith, or futility" were amendment allowed.  *In re Triangle Cap. Corp. Sec. Litig.*, 988 F.3d 743, 750 (4th Cir. 2021) (quoting *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 510 (4th Cir. 1986)).  A proposed amendment is considered futile if, as alleged, the claim fails as a matter of law.  *Id.*  The Court, therefore, employs the same analysis as if the claim were challenged under

Rule 12(b)(6); it accepts the allegations in the Amended Complaint as true and construes all facts and reasonable inferences most favorably to Simmons. *See Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997); *see also Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

Because the MFCA and FCA are considered *in pari materia*, the Court treats the proposed claims together.[2] *E.g., Gharib v. J. Comm. on Pol. Econ. Good Soc'y*, No. GJH-17-3476, 2018 WL 4679954, at *7–8 (D. Md. Sept. 27, 2018) (addressing retaliation under Md. Gen. Code § 8-107). At its heart, these statutes prohibit any person from presenting "a false or fraudulent claim for payment or approval" to the government. *United States v. Grant*, 912 F.3d 190,196 (4th Cir. 2018) (quoting 31 U.S.C. § 3729(a)). Employees who endeavor to stop false claims violations receive statutory protection from retaliatory adverse employment action. *See id.* at 200.[3] "Protected activity" includes an employee's efforts to prevent an FCA violation based on an "objectively reasonable" belief that the employer is violating or will soon violate the FCA. *Id.* at 201; *see Mason v. Netcom Techs., Inc.*, No. PWG-20-03558, 2021 WL 4286535, at *3 (D. Md. Sept. 21, 2021); *see also* Md. Health-Gen. Code §§ 2-602, 2-607.

Capital Health principally argues that amendment should be denied because the FCA claims still fail as a matter of law and are, therefore, futile. ECF Nos. 15 at 7–11; 17 at 5–7. The

---

[2] Section 2-602(a)(9) of the MFCA imposes liability, in relevant part, when a person "knowingly" makes a false claim or false record that is used to make a false claim to a State health plan or program. Md. Health-Gen. Code §§ 2-602(a)(9); *see also* Md. Health-Gen. Code §§ 2-601(b)(1). And an employer may not retaliate against an employee who reports or "refuses to participate in any activity, policy, or practice that the employee […] reasonably believes" would violate Section 2-602(a). Md. Health-Gen. Code § 2-607(a)(4); *cf.* 31 U.S.C. § 3730(h)(1) (providing protection from retaliation for employees who take lawful acts "in furtherance of an [FCA] action under this section or other efforts to stop 1 or more [FCA] violations.").

[3] Section 3730(h)(1) of the FCA provides that "[a]ny employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h)(1).

Court disagrees. As with the original Complaint, the Amended Complaint plausibly avers that Simmons objected to using Lee's bed counting method for infection rate reporting purposes, and that her employer, through its supervisors, knew of Simmons' objections. Shortly after, Simmons was fired, making plausible that her termination was in response to her protests.

But the Amended Complaint goes further. It also makes plausible that Simmons' resistance to Lee's bedspace count constitutes an attempt to stop a looming FCA violation, and that Capital Health was on notice of a potential FCA claim. *See Grant*, 912 F.3d at 200; 31 U.S.C. § 3730(h)(1). The Amended Complaint now explains how Lee's demands could constitute an FCA violation; particularly how an artificially inflated bed count "would inaccurately suppress infection rates," leading to a falsely favorable QBR score. ECF No. 14-1 ¶¶ 46, 93–99. In turn, a more favorable QBR score, as Capital Health well knew, would commensurately increase its rate of reimbursement charged to Medicare, Medicaid and state insurance plans, which would constitute a false claim made to receive federal or State payments. *Id.*

The Amended Complaint also makes plausible that Capital Health, through its supervisors, knew that it was poised to commit an FCA violation if it adopted Lee's bed count method. Indeed, Capital Health had taken a sizeable financial hit as a result of its previous QBR score. ECF No. 14-1 ¶ 93. Lee also knew that a more favorable QBR score, as buoyed by a better standardized infection ratio, would mean greater ability to charge federal and State healthcare agencies higher rates. ECF No. 14-1 ¶¶ 80–99. Accordingly, Capital Health's termination of Simmons so close in time to having bucked Lee's counting method makes plausible she was fired because she protested the likely commission of an FCA violation.

Because the additional facts make plausible a state and federal FCA claim, amendment is not futile and is in the interests of justice. The case is in its infancy, Simmons has not previously sought leave to amend the Complaint, and formal discovery has yet to commence. Accordingly, Capital Health will suffer no prejudice were amendment granted. Nor does Capital Health convince this Court that the proposed amendment is pursued in bad faith. True, Simmons could have pleaded from the outset a more robust version of her FCA claims. But the passage of time alone does not equate to "bad faith," especially where this Court invited Simmons to amend her Complaint as to other claims. *See Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 193 (4th Cir. 2009) ("[D]elay alone is insufficient reason to deny a motion to amend."). Moreover, nothing else suggests that Simmons seeks leave to amend in bad faith or with some dilatory purpose. *Cf. Alston v. TowneBank*, No. GJH-20-690, 2022 WL 743934, at *3 (D. Md. Mar. 11, 2022) (denying plaintiff's motion for leave to file a fourth amended complaint as in bad faith when motion was brought for purpose of mooting defendant's motion to dismiss, and plaintiff had been afforded multiple opportunities to amend). Amendment, in short, is squarely warranted and will be granted. The proposed Amended Complaint is now the operative one.

On that score, the Court addresses a final housekeeping matter. Simmons separately urges the Court to "reconsider" its prior decision dismissing the federal FCA claim as pleaded in the *original* Complaint. *See* ECF No. 16. But that request makes little sense. The original Complaint was, and is, still legally deficient. Thus, the motion to reconsider must be denied.

That said, the Court has granted leave to amend under Rule 15, as it is permitted to do, even to cure defects in claims previously dismissed with prejudice. *See Karn v. PTS of America, LLC*, No. GJH-16-3261, 2018 WL 3608772, at *2 (D. Md. July 26, 2018) (granting amendment

8

under Rule 15 instead of Rules 54, 59, or 60 when plaintiff moved to amend complaint with additional facts making plausible a claim presumptively dismissed with prejudice); *see also Adbul-Mumit*, 896 F.3d at 293 (*citing Katyle v. Penn Nat. Gaming, Inc.*, 637 F.3d 462, 471 (4th Cir. 2011) ("A court should evaluate a postjudgment motion to amend the complaint 'under the same legal standard as a similar motion filed before judgment was entered.'"); *see also Laber*, 438 F.3d at 427–28 ("[A] district court may not deny [a motion to amend the complaint] simply because it has entered judgment against the plaintiff." ).  Because the Court has granted amendment, and the federal FCA claim is now made plausible, the Court considers that claim as part of the operative Complaint as brought under the False Claims Act, 31 U.S.C. § 3730(h). For clarity, Simmons is directed to file a corrected Amended Complaint that includes a separate count for the federal FCA claim.

## IV.   Conclusion

For the above stated reasons, Simmons motion for leave to amend the complaint (ECF No. 14) is GRANTED, and the motion to reconsider (ECF No. 16) is DENIED.   A separate Order follows.

6/8/2022  
Date

_____/S/_____  
Paula Xinis  
United States District Judge