IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| KRISTIN SIMMONS, | * | |
| | * | |
| Plaintiff, | * | |
| | * | Civ. No. MJM-21-2074 |
| v. | * | |
| | * | |
| UM CAPITAL REGION, | * | |
| HEALTH, INC., *et al.*, | * | |
| | * | |
| Defendants. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Kristin Simmons ("Plaintiff") brought this civil action under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12112(a) and 12203(a); the Maryland False Claim Act ("MFCA"), Md. Code Ann. Health Gen. § 2-607; and the False Claims Act ("FCA"), 31 U.S.C. § 3730(h), against UM Capital Region Health, Inc. and Dimensions Health Corporation d/b/a UM Capital Region Health, Inc. (collectively, "Defendants"). This matter is before the Court on Defendant's Motion for Summary Judgment (the "Motion"). ECF No. 60. The Motion is fully briefed and ripe for disposition. No hearing is necessary. *See* Local Rule 105.6 (D. Md. 2023). For the reasons set forth below, the Court shall grant Defendant's Motion for Summary Judgment.

## I.    BACKGROUND

### A.  Factual Background

UM Capital Region Health, Inc. ("UM Capital") is a medical facility located in Cheverly, Maryland and part of the University of Maryland Medical System ("UMMS").

1

In September 2017, UM Capital hired Plaintiff as an Infection Control Practitioner. ECF No. 60-2 at 15:12–13 (Defendants' Exhibit 1, deposition of Ingrid Connerney). At the time she was hired, Plaintiff had approximately two and a half years of infection prevention experience. ECF No. 60-6 at 1 (Defendants' Exhibit 5, Kristin Simmons resume). When Plaintiff was hired, she was placed on a probationary period for 90 days. ECF No. 60-3 at 71:4–5 (Defendants' Exhibit 2, deposition of Ms. Lee). Plaintiff's direct supervisor was Ms. Yeo-Jin Lee, the Director of Infection Prevention. *Id.* at 29:11–14.

Plaintiff has fascia scapular humeral muscular dystrophy ("FSH"), which is a progressive degenerative neuromuscular disorder. [1] ECF No. 61-2 at 13:1, 17:1–14 (Plaintiff's Exhibit 1, deposition of Kristin Simmons). Plaintiff originally disclosed her disability on her pre-hire paperwork. *Id.* at 43:20–44:9.

From the beginning of Plaintiff's employment, Ms. Lee noted that Plaintiff struggled with reporting to her. Specifically, Ms. Lee felt that Plaintiff was disengaged and did not work collaboratively with her, and Ms. Lee believed that Plaintiff's behavior interfered with Ms. Lee's ability to build a cohesive team. ECF No. 60-3 at 56:15–57:1. For example, Plaintiff was disengaged and distracted during meetings and would talk to those around her or focus on other papers or her computer. *Id.* Two months into her employment, Plaintiff had a new employee follow-up meeting in which Ms. Lee's feedback listed team communication and courtesy and respect for others as areas to improve. ECF No. 60-7 (Defendants' Exhibit 6, New Employee Follow Up Meeting). Around the same time, Ms. Lee contacted human resources about her concerns with Plaintiff's behavior. ECF No. 60-3 at 57:10–14.

---

[1] Also called Facioscapulohumeral Muscular Dystrophy, FSHD, *Muscular Dystrophy Association*, https://www.mda.org/disease/facioscapulohumeral-muscular-dystrophy/ (last visited Feb. 13, 2025).

On November 17, 2017, Ms. Lee met with Plaintiff in the presence of Ms. Laura Louis-Fils, a human resources manager, to discuss Ms. Lee's concerns. ECF No. 60-8 (Defendants' Exhibit 7, November 17, 2017, Meeting with Kristin Simmons Notes). During the meeting, Ms. Lee highlighted her concerns, including occasions that Ms. Lee felt Plaintiff was being rude to her including avoiding eye contact, being unwilling to speak or work, being disengaged, failing to respond to emails, and not being a good team member. *Id.* Ms. Lee also explained her communication expectations, including, among other things, communicating with courtesy and respect, being engaged at team meetings, and promoting open communication. *Id.* Plaintiff states that at that meeting, Ms. Lee told Plaintiff that she did not like her face and that she thought Plaintiff looked angry and disinterested during meetings.[2]  ECF No. 61-2 at 42:14–21.

Following that meeting, Plaintiff arranged a meeting with Ms. Louis-Fils during which she disclosed her disability and explained that it affected the muscles in her face resulting in her facial expression being misconstrued as unfriendly. *Id.* at 42:22–43:10.

Because of Ms. Lee's concerns with Plaintiff's performance, in December 2017, Ms. Lee extended Plaintiff's 90-day probationary period by an additional 30 days. ECF No. 60-3 at 71:4–13. Ms. Lee communicated her decision to Plaintiff on or about December 15, 2017. ECF No. 60-9 (Defendants' Exhibit 8, Initial Evaluation Note). In her Initial Evaluation Note, Ms. Lee explained that she extended Plaintiff's probationary period because "there has been little change in her negative perception of [Ms. Lee's] communication style," and Plaintiff's general disrespect "reflect [Plaintiff's] unwillingness to put effort toward [the goal of building an effective and cooperative team]." *Id.* Ms. Lee communicated the following expectations to Plaintiff:

---

[2] With regard to facial expressions, notes from the meeting say: "[a]void eye contact, unwillingness to speak or work, not engaged in morning huddle or other team meetings (e.g., looking at papers, not listening, giving a blank face when ask questions about discussion)." ECF No. 60-8.

"Communicate to the director with respect"; "Be engaged at team meetings"; "Promote open communication to foster partnership and collaboration . . ."; and "Communicate the status of projects in a timely manner[.]" *Id.* Plaintiff sent an email summarizing the meeting, noting that she would continue to work on her communication skills and acknowledging that she is working on being more extroverted. ECF No. 60-10 (Defendants' Exhibit 9, 90-day review follow-up email). On January 19, 2018, Plaintiff completed her extended probationary period. ECF No. 60-11 (Defendants' Exhibit 10, Initial Review Period Evaluation).

According to Defendants, once her probationary period ended, Plaintiff reverted to her prior problematic behavior with respect to communication and lack of teamwork and collaboration. ECF No. 60-2 at 15:18–16:3, 16:9–20. In early February 2018, Plaintiff contacted Ms. Louis-Fils regarding the ongoing communication issues with Ms. Lee. *See id.*; ECF No. 60-12 (Defendants' Exhibit. 11, Ingrid Connerney's February 14, 2018, Notes). Plaintiff emailed Ms. Louis-Fils complaining that Ms. Lee had berated her to the point of tears. ECF No. 60-13 (Defendants' Exhibit 12, Follow-Up: IP Department Email Chain). Plaintiff stated that she was uncomfortable being alone with Ms. Lee: "I am uncomfortable being alone with [Ms. Lee] . . . . If she does not have enough emotional intelligence to adapt her approach when she brings an employee to tears, I don't know that a discussion with her is going to fix it." *Id.* These issues led to Ms. Ingrid Connerney, Chief Quality Officer for UM Capital, setting up a meeting with herself, Plaintiff, and Ms. Lee to discuss communication and collaboration. ECF No. 60-12. Plaintiff expressed that she felt that Ms. Lee treated her as "infantile." *Id.*, *see also* ECF No. 60-1, ¶¶ 22–25.

The three met again on March 2, 2018. ECF No. 60-14 (Defendants' Exhibit 13, Ingrid Connerney's March 2, 2018, Handwritten Notes); ECF No. 60-1 at 95:3–13 (identifying her handwriting). According to the notes, Ms. Lee voiced displeasure with Plaintiff's continued failure

to communicate, stating that she did not nod, did not talk, and just stared off into space. ECF No. 60-14. At that time, Plaintiff disclosed her disability that impacted her ability to smile and make other facial expressions. *Id.* Ms. Connerney responded that Plaintiff could use her words, for example, saying "I hear you" or "I understand," or nod to show engagement. *Id.*

After disclosing her disability, Plaintiff filed a complaint with human resources ("HR") alleging that Ms. Lee and Ms. Connerney forced her to disclose her medical condition. ECF No. 61-2 at 70:15–21. According to Defendants, the allegations were investigated and found to be unsubstantiated, ECF No. 60-19, although Plaintiff contends that her concerns were swept under the rug, ECF No. 61-2 at 70:11–71:1.

In response to Plaintiff's HR complaint regarding forced disclosure of her disability, Ms. Margaret Fisher, an HR employee, stated that Plaintiff's allegations could not be confirmed. ECF No. 61-22 (Plaintiff's Exhibit 21, emails between Plaintiff and Ms. Fisher with the subject line, Re: EEO Update). Ms. Fisher also informed Plaintiff that failing to communicate with her manager could result in her violating some employee policies, including Employee Conduct and Progressive Disciplinary Action #230-601 and Professional Behavior #230-608. *Id.* On or about April 27, 2018, Plaintiff supplemented her accommodation request and sought an exemption from Employee Conduct and Progressive Disciplinary Action #230-601 and Professional Behavior #230-608, "as they apply to any facial expressions and non-verbal responses or lack thereof." ECF No. 60-16 (Defendants' Exhibit 15, Accommodations Addendum). Plaintiff requested "[a]ssurances that [her] facial expressions will not negatively impact [her] performance evaluations." *Id.* The doctor's note attached to the addendum sought "[r]educed stress associated with interactions with [Plaintiff's] manager. Either interactions need to be supervised by a third party to alleviate stress or interactions should be followed up with a written account of what was discussed and any new

5

expectations to alleviate anxiety over misinterpretation." *Id.* On May 3, 2018, Plaintiff's request for a sit-to-stand desk was approved[3] while her request for exemption from various policies was denied after a determination that the requests "do not fall under the American Disability Act (ADA) and therefore cannot be accommodated." ECF No. 60-18 (Defendants' Exhibit 17, letter regarding Plaintiff's requests for reasonable accommodation).

Following the denial of her request, Plaintiff sent an email to Ms. Arlinda Peoples, a UMMS corporate compliance analyst, detailing her displeasure and noting her concern that ADA and Equal Employment Opportunity Commission ("EEOC") regulations were not being followed. ECF No. 61-24 (Plaintiff Exhibit 23, emails between Ms. Peoples and Plaintiff). Following her email to Ms. Peoples, Plaintiff was provided a manual sit-to-stand desk while the electric desk was ordered. ECF No. 60-19 (Defendants' Exhibit 18, memorandum regarding Plaintiff). On June 6, 2018, HR representatives Ms. Veronica Ford and Ms. Regina Bryan met separately with Plaintiff and Ms. Lee. *Id.* Plaintiff asked that all changes in priorities, expectations, and goals be put in writing and that minutes for department meetings and recaps of one-on-one meetings be provided. *Id.* By August 2018, meetings between Plaintiff and Ms. Lee were supervised by an HR representative. ECF No. 61-2 at 79:9–16. Plaintiff stated that Ms. Lee stopped scheduling one-on-one meetings with her in November 2018, four months prior to her termination, with no explanation. *Id.* at 134:19–135:5.

In December 2018, the hospital began looking for ways to obtain additional intensive care unit ("ICU") beds because of frequent shortages. ECF No. 60-2 at 51:13–16. One of the options was converting four post-anesthesia care unit ("PACU") beds into permanent ICU beds. ECF No.

---

[3] In April 2018, Plaintiff submitted a request for an accommodation for a sit-to-stand desk. ECF No. 61-2 at 77:15–78:7. That request was granted, and Plaintiff was given a manual sit-to-stand desk. *Id.* at 78:3–7. She then submitted a new request for an electronic sit-to-stand desk which was granted. *Id.* at 78:8–12.

60-3 at 217: 9–16. At that time, those four beds, which were in a separate area behind a closed door, were already being used as ICU overflow beds. *Id.* at 215:16–216:1. In order for the hospital to remap the PACU beds as permanent ICU beds, including having the infection prevention team track and report infections to the National Healthcare Safety Network ("NHSN"),[4] the beds would need to meet the NHSN's "80 percent rule," also known as the "80/20 rule." ECF No. 60-3 at 107:4–5. In other words, the beds would need to be occupied by ICU patients 80 percent of the time to be designated as ICU beds for reporting purposes. *Id.* at 107:4–8. To determine whether the beds met the 80 percent rule, the infection prevention team needed to collect data for at least one month to understand the patient utilization of the beds and determine whether ICU patients were actually utilizing the PACU beds 80 percent of the time. ECF No. 60-2 at 52:15–53:1. If the beds passed the 80 percent rule, the infection prevention team was to determine how it could incorporate those new ICU beds into its surveillance and data collection for reporting purposes. ECF No. 60-3 at 87:14–20; 101:5–10.

Plaintiff was already assigned to collect data from the ICU beds. *Id.* at 88:2. On December 21, 2018, Ms. Lee asked that Plaintiff begin collecting data on the four PACU beds. ECF No. 60-25 (Exhibit 24, 12/21/18 Infection Prevention Team Huddle) (listed under the discussion column for Plaintiff, "Will speak with Toni re: counting PACU/ICU device and patient days."). Plaintiff was to begin collecting data from the PACU beds on January 1, 2019. ECF No. 60-26 at 4 (Exhibit

---

[4] NHSN is a national tracking system for infection data associated with health care services. It has rules for how hospitals should code each designated area in its system. ECF No. 60-1, ¶ 42. A change in designation—for example, from PACU to ICU—would impact how the hospital's infection data for those beds should be surveyed, collected, and reported. *Id.* (citing ECF No. 60-2 at 52:15–21; ECF No. 60-3 at 106:4–107:19). Due to the patient population in PACU beds (temporary post-operation and post-anesthesia patients), there is no requirement to collect or report the infection data. *Id.* (citing ECF No. 60-3 at 89:2–4, 216:7–19). In contrast, the infection prevention team regularly collected and reported infection data for ICU beds to NHSN. *Id.* (citing ECF No. 60-3 at 103:6–10).

25, email chain between Ms. Lee and Plaintiff). The same day she received this assignment,

Plaintiff sent an inquiry to NHSN by email describing a "hypothetical situation" as follows:

> I have a question about potentially combining areas containing the same patient population that are in physically separate areas.
>
> A hypothetical situation:
> - A facility needs more ICU beds but cannot construct a new unit
> - Facility finds in their PACU area (normally classified as outpatient) that could serve as ICU beds
> - Facility then designates four PACU beds as permanent ICU beds, serving the same population as the existing, physically separate ICU
>
> In this case, how would the facility capture the patient days and device days from those four additional ICU beds? Do they need to be mapped as completely separate virtual location, as they are physically separated from the main ICU? Can their numbers simply be added on the main ICU's numbers?
>
> Further complicating this scenario, what if the four beds in question are not always going to be ICU beds and might house a different type of patient on occasion? Does the 80/20 rule apply in this case?
>
> I guess what I'm looking for is the best (and NHSN-approved) way to capture the new ICU beds' patient and device days.

ECF No. 60-27 at 2–3 (Defendants' Exhibit 26, email from Plaintiff with the subject line, Query:

bed location and designation). At the time, Plaintiff believed that Ms. Lee's plan was to add the

PACU beds into the ICU numbers, and her email to NHSN reflected that understanding.[5] ECF No.

61-2 at 59:10–16.

---

[5] In a later email to Ms. Connerney, Plaintiff stated that she brought up her concerns with Ms. Lee. *See* ECF No. 61-14 (Plaintiff's Exhibit 13, NHSN reporting incident). She stated, "Knowing that NHSN does not permit that, as the units are in separate physical locations, I questioned whether we would be allowed to do that. My concerns were dismissed. I have asked her repeatedly since that time to please check the rules and make sure that it's OK to add the PACU numbers to into ICU. Finally, as I was getting nowhere with [Ms. Lee], I sent an email to the helpline at NHSN, outlining the scenario and asking for advice." Defendant notes that in her December 28 email with Ms. Lee, the same day Plaintiff received a response from NHSN, she did not disclose that she had reached out to NHSN, or otherwise raise concerns about defrauding the government or submitting false or fraudulent numbers to NHSN. ECF No. 60-1, ¶ 54.

In an email to Ms. Lee on December 27, 2018, Plaintiff described the assignment as having been made "abruptly" and stated that she could not "predict that this will go smoothly[,]" but also stated that she was "hoping to meet with Francie today to get a feel for the device collection process in CCC and how the PACU is going to be staffed/supervised." ECF No. 60-26 at 3 (black typeface at the bottom third of the page). Ms. Lee responded later that day in red typeface, disputing that the assignment was "abrupt" and stating that it should not be too difficult to collect device days. *Id.*

The following day, the NHSN responded to Plaintiff's inquiry, stating in part:

> For your hypothetical situation, I would only add a virtual location for those designated ICU beds if they were to meet the 80/20 rule consistently every month. They would report data separately in this unit apart from the other ICU units. If this area does not meet the 80/20 rule for ICU beds, it will have to be classified as a different location that meets an NHSN definition.

ECF No. 60-27 at 2. Plaintiff then forwarded that email exchange to her team members, but not to Ms. Lee, stating:

> In summary: No, you can't add the PACU-ICU beds into the main ICU denominators to pad the numbers. Creating a separate virtual location would just be setting us up for failure, I think, because with the tiny denominators it'll generate, any infections (and we know there will be infections – see the CAUTI from October) will look astronomically bad. In addition, we know that those beds are not permanent ICU beds – they've been using them for any unit that needs space, med/surg included.

> I don't think this is going to end well. I'm forwarding this to you guys as an insurance plan in case she somehow tries to pin this on me.

*Id.*

After sending that email to others, not including Ms. Lee, Plaintiff responded to the email chain with Ms. Lee in blue typeface, saying, as relevant here:

> I think getting the staff to correctly collect the PACU-ICU numbers starting January 1 is not feasible. Related to this, I'm not sure it's

acceptable, from an NHSN perspective, to simply add the PACU-ICU numbers into the main ICU numbers, as you instructed. I would think that, being a separate physical location, to capture the PACU-ICU beds, a virtual location would have to be created. The problem with that is that is the beds are not used by ICU consistently enough to meet the 80/20 rule (and from what Francie tells me, they may not – they've had PCRU and med/surg patients in them recently), we would have to call it mixed acuity which isn't reportable to CMS anyway. Even if we could call it its own 4-bed ICU, I think we might be shooting ourselves in the foot a little because any infection (like the CAUTI in October) would completely tank our rates, given such a miniscule denominator. Please let me know if there is something I'm missing here, or if there are major changes coming to the bed-assignment process that haven't been communicated to us yet.

ECF No. 60-26 at 3–4. Ms. Lee responded later that day, "Because of that uncertainty of the bed utilization, we need to start collect data to determine further about this. . . ." *Id.* at 2.

On January 1, 2019, Plaintiff failed to begin collecting the utilization data as instructed. ECF No. 61-25 at 115:11–16 (Plaintiff's Exhibit 24, deposition of Ms. Lee). Instead, Ms. Lee collected the data herself and determined that the four beds did not meet the 80 percent rule. *Id.* at 108:6–11. On or about January 10, 2019, after Plaintiff suggested that the hospital create a virtual location, Ms. Lee told Plaintiff that she would consult NHSN herself. ECF No. 60-21 at 5; ECF No. 61-25 at 118:1–13. Plaintiff then disclosed to Ms. Lee that she previously reached out to NHSN about this issue. ECF No. 6-21 at 5; ECF No. 61-25 at 116:17–118:13. Ms. Lee was displeased that Plaintiff had failed to disclose her contact with NHSN until that point. ECF No. 61-25 at 117:12–17. *See also* ECF No. 61-14.

Around the same time, Ms. Connerney was setting up individual meetings with the members of the infection prevention team to discuss the ongoing communication and team functioning issues. ECF No. 60-2 at 34:14–36:21; ECF No. 60-28 (Defendants' Exhibit 27, Team Functioning Meeting Notes). She met with Plaintiff, Ms. Kisha Gates, and Ms. Cindy Rosenberger, all three of Ms. Lee's direct reports. ECF No. 60-28. Both Ms. Rosenberger and Ms. Gates noted

10

various interactions between Ms. Lee and Plaintiff that raised concerns, and Ms. Rosenberger suggested ways to improve team dynamics and communication. *See id.* These concerns included Plaintiff's late disclosure of having contacted NHSN and received a response about the ICU bed-counting issue. *See id.*

Ms. Connerney met with Plaintiff on January 14, 2019, and Plaintiff expressed dissatisfaction with Ms. Lee's management style and lack of trust in team members. *Id.*; *see also* ECF No. 61-14 (Plaintiff's Exhibit 13, follow-up email from Plaintiff with the subject line, NHSN reportin incident). In a follow-up email to Ms. Connerney, Plaintiff stated her understanding of Ms. Lee's plan to add the four PACU beds totals for ICU beds and claimed that, upon receipt of the bed-counting assignment, Plaintiff asked Ms. Lee to "check the rules and make sure that it's OK to add the PACU numbers into ICU." *Id.* In the email, Plaintiff further stated that she contacted NHSN about the situation after "getting nowhere with [Ms. Lee,]" that NHSN confirmed Plaintiff's belief that a virtual unit would need to be created, and that, when Plaintiff asked Ms. Lee to check the NHSN rules again on December 28th, Ms. Lee "did not address [her] NHSN concerns."[6] *Id.* Plaintiff continued, writing that, during their meeting on January 10th, Ms. Lee "once again expressed that her intention is to simply add the PACU numbers into another unit" and Plaintiff then protested that this plan was "not allowed" and "was forced" to disclose her contacts with NHSN about the issue. *Id.* At that point, Plaintiff claimed in the email, Ms. Lee "lost all composure" and began yelling at Plaintiff. *Id.* Plaintiff further stated in the email that she believed herself to be "completely justified in [her] actions[,]" continuing: "I would not want our facility to suffer any repercussions for violating NHSN's rules and I am deeply concerned that

---

[6] The Court notes that Ms. Lee did respond about the NHSN issue on December 28th, stating that "[b]ecause of [the] uncertainty of the bed utilization, [they] need[ed] to start collect[ing] data to determine further about this." ECF No. 60-26 at 2. Additionally, it is unclear from the record whether Plaintiff actually raised her concerns about NHSN rules with Ms. Lee before she contacted NHSN herself.

[Ms. Lee] would seemingly readily ignore those rules (and therefore federal law), had she not been presented with incontrovertible evidence." *Id.*

Toward the end of January 2019 and beginning of February 2019, Ms. Lee, Ms. Connerney, and Ms. Ford made the decision to terminate Plaintiff's employment. ECF No. 60-2 at 62:6–63–14; ECF No. 60-3 at 30:4–33:12. Ms. Lee and Ms. Connerney each drafted a memorandum to HR outlining issues with Plaintiff's behavior during her employment. ECF No. 60-29 (Defendants' Exhibit 28, February 3, 2019, Re: Infection Prevention Coordinator Kristin Simmons); ECF No. 60-30 (Defendants' Exhibit 29, February 5, 2019, Re: Infection Prevention Coordinator, Kristin Simmons). Both managers noted instances of disrespect and poor communication between Ms. Lee and Plaintiff.[7]  ECF Nos. 60-29, 60-30.

### B.  Procedural Background

Plaintiff filed the initial Complaint in the Circuit Court for Prince George's County, asserting claims against Defendants. ECF No. 5. The matter was removed to this Court on August 16, 2021. ECF No. 1. Defendants filed a motion to dismiss on August 23, 2021. ECF No. 8. The Court granted the motion on June 8, 2022. ECF Nos. 11,  12. The Court later granted Plaintiff leave to amend. ECF Nos. 18, 19. On June 15, 2022, Plaintiff filed a Second Amended Complaint, Plaintiff's presently operative pleading. ECF No. 20. In the Second Amended Complaint, Plaintiff asserts claims for discrimination and retaliation under the ADA, as amended (Counts I and II, respectively); retaliation under the MFCA (Count III); and violation of the FCA (Count IV). Defendants filed an Answer on July 13, 2022. ECF No. 24.

---

[7] Plaintiff points out that her facial expressions were negatively referenced/alluded to and factored into her evaluations throughout her tenure at UM Capital. ECF No. 61 at 3–4. *See e.g.*, ECF No. 60-9; ECF No. 60-14; ECF No. 61-7 (Plaintiff's Exhibit 6, Ms. Connerney handwritten notes from January 30, 2019); ECF No. 60-30.

Defendants filed a motion for summary judgment on April 19, 2024, ECF No. 60; Plaintiff filed a response in opposition on May 5, 2024, ECF No. 61; and Defendants replied on May 17, 2024, ECF No. 62.

## II.    STANDARD OF REVIEW

A court may grant a party's summary judgment motion under Rule 56 if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020). A fact is "material" if it "might affect the outcome of the suit under the governing law[,]" and a genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986) (emphasis removed); *see also Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016). A party can establish the absence or presence of a genuinely disputed fact through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). The court must view all the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmovant, *Matsushita Elec. Indus.*, 475 U.S. at 587, but the court is not permitted to weigh the evidence, make credibility determinations, or decide the truth of disputed facts, *Anderson*, 477 U.S. at 249.

"The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine dispute of material fact." *Med. Mut. Ins. Co. of N. Carolina v. Gnik*, 93 F.4th 192, 200 (4th Cir. 2024) (citing *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522

(4th Cir. 2003)). The burden then shifts to the non-movant to "set forth specific facts showing that there is a genuine issue for trial." *Bouchat*, 346 F.3d at 522 (quoting Fed. R. Civ. P. 56(e)).

## III.    DISCUSSION

### A.  Count I – ADA Discrimination

In Count I, Plaintiff contends that Defendants discriminated against her by harassing, taunting, and intimidating her because of her disability; took adverse actions against her, including demanding she change her face and body, refusing to meet with her, and terminating her employment; and did so for discriminatory reasons in violation of the ADA. ECF No. 20, ¶¶ 53–63.

The ADA was enacted "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities[,]" and "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities[.]" 42 U.S.C. §§ 12101(b). The statute prohibits discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Thus, in relevant part, the ADA bars the discharge of a qualified employee because she is disabled. *Summers v. Altarum Inst., Corp.*, 740 F.3d 325, 328 (4th Cir. 2014).

"If a plaintiff establishes a *prima facie* case of unlawful discrimination, a presumption of illegal discrimination arises, and the burden of production shifts to the employer to produce evidence of a legitimate, non-discriminatory reason for its adverse action." *EEOC v. Manufacturers & Traders Tr. Co.*, 429 F. Supp. 3d 89, 119 (D. Md. 2019) (citation omitted). If the employer does so, the burden then shifts back to the plaintiff to show by a preponderance of

evidence that defendant's proffered reason was pretextual, and that unlawful discrimination was the true reason. *Id.* at 121.

At summary judgment, "where the employer proffered evidence of a legitimate reason for its adverse action in its motion for summary judgment, the Fourth Circuit has assumed, without deciding, that the plaintiff established a *prima facie* case." *Manufacturers & Traders Tr. Co.*, 429 F. Supp. 3d at 120. To overcome the employer's legitimate, non-discriminatory reason for its action, a plaintiff must prove "both that the reason was false, and that discrimination was the real reason." *Id.* at 121 (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)); *accord St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993).

To prove employment discrimination on account of her disability, the plaintiff "must establish [her] disability was the 'but-for' cause of an adverse employment decision." *Davis v. W. Carolina Univ.*, 695 F. App'x 686, 688 (4th Cir. 2017) (*citing Gentry v. E. W. Partners Club Mgmt. Co.*, 816 F.3d 228, 235 (4th Cir. 2016)). But-for causation "is established whenever a particular outcome would not have happened 'but for' the purported cause." *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 656 (2020). "In other words, a but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause." *Id.* As Justice Gorsuch noted, "[t]his can be a sweeping standard. Often, events have multiple but-for causes." *Id.* This means that "a defendant cannot avoid liability just by citing some other factor that contributed to its challenged employment decision. So long as the plaintiff's [protected classification] was one but-for cause of that decision, that is enough to trigger the law." *Id.*

"[T]he plaintiff cannot seek to expose [the employer's] rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it" because "[t]he former would not create a genuine dispute, the latter

would fail to be material." *Manufacturers & Traders Tr. Co.*, 429 F. Supp. 3d at 121 (citation omitted). "Rather, to show pretext, a plaintiff must proffer sufficient evidence such that a reasonable trier of fact could conclude that the employer's explanation is false or unworthy of credence, and that discrimination was the true reason for the adverse employment action." *Id.* (citation omitted). "When the question at issue is whether the decision maker acted with discriminatory animus, only the perception of the decision maker is relevant to the question." *Id.* at 121–22 (citing *Hux v. City of Newport News, Va.*, 451 F.3d 311, 319 (4th Cir. 2006)) (quotations omitted).

"In assessing a defendant's proffered reasons, the Fourth Circuit has repeatedly observed that it is not a court's province to decide whether an employer's reason for terminating an employee was wise, fair, or even correct, ultimately, so long as it truly was the reason for the employee's termination." *Id.* at 122 (citation omitted). Simply put, "an employment discrimination claim is not a vehicle for substituting the judgment of a court for that of the employer." *Id.* (citation omitted). "A plaintiff may not rely solely on [her] own assertions of discrimination to persuade a trier of fact." *Id.* at 122 (citing *Adams v. Trustees of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011)) (cleaned up). "When a plaintiff fails to present any other evidence—beyond baseless speculation—that [the employer's] stated reason was pretextual, [the] trier of fact would be hard-pressed to conclude that [the plaintiff] established pretext." *Id.* (quotation marks omitted). Moreover, "when a plaintiff has presented nothing sufficient to raise a material issue of fact to place before the fact finder, her claim will not survive a motion for summary judgment." *Id.* at 122–23. But "if a plaintiff presents evidence or legitimate argument that could persuade a rational fact finder to disbelieve the defendant's justification for its employment decision, summary judgment in favor of the employer is not appropriate." *Id.* at 123.

Here, Defendants proffer legitimate, non-discriminatory reasons for terminating Plaintiff's employment. Defendants contend that Plaintiff was terminated because of "rude and disrespectful behavior that on occasion amounted to insubordination and negatively impacted the" collaborative environment and team building efforts of Ms. Connerney and Ms. Lee. ECF No. 60-1 at 27. They cite Plaintiff's inability to conform to requested communication requirements, like answering emails, and her inability to work in a team environment. *See* ECF No. 60-30. Plaintiff argues that Ms. Lee's perception of rudeness and insubordination was based, in part, on Plaintiff's disability and that Plaintiff's only performance review indicated that she was a well-functioning team member. The dispositive question presented in Defendants' motion is whether Plaintiff presents a genuine dispute of material fact as to whether Defendants' proffered reason was pretext for intentional discrimination and Plaintiff's disability was a but-for cause of her termination.

Plaintiff has not produced sufficient evidence for a reasonable jury to find that Defendants' non-discriminatory reason was not the actual reason for termination and that they intentionally discriminated against Plaintiff based on her disability. *Manufacturers & Traders Tr. Co.*, 429 F. Supp. 3d at 121–22. Plaintiff argues that Ms. Lee's perception of rudeness and insubordination was based, in part, on facial expressions made by Plaintiff as a result of her disability. But the only evidence that refers to Plaintiff's facial expression as a potential basis for employment action is found in notes from a meeting on November 17, 2017. In those notes, under a bullet point listing times Ms. Lee felt that Plaintiff was rude to her, one entry states, "giving a blank face when ask questions about discussion." ECF No. 60-8. There are other references to Plaintiff rolling her eyes or avoiding eye contact, two acts that she does not contend are connected with her disability. *See id.*; ECF No. 60-8; 60-30. Even though Plaintiff's singular performance review from Ms. Lee is mostly positive, it cannot be read out of the larger context of Plaintiff's workplace conduct, which

includes fraught communications and interactions between Ms. Lee and Plaintiff that management viewed as disrespect and insubordination by Plaintiff.

Because Plaintiff fails to produce sufficient evidence that Defendants' proffered reason for termination was pretextual and that they intentionally discriminated against Plaintiff based on her disability, Defendants' motion for summary judgment shall be granted as to Count I.

### B. Count II – ADA Retaliation

In Count II, Plaintiff contends that Defendants retaliated against her after Plaintiff participated in protected activities, such as requesting accommodations, by excluding her from meetings, setting unreasonable deadlines, calling her out in front of other employees, and ultimately terminating her. ECF No. 20, ¶¶ 67–77.

The ADA bars employers from retaliating against employees for seeking the ADA's statutory protections. 42 U.S.C. § 12203(a)–(b). It prohibits retaliation against an employee "because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA]." 42 U.S.C. § 12203(a).

To establish a *prima facie* case of retaliation under the ADA, a plaintiff must show that "(1) she has engaged in protected conduct; (2) she suffered an adverse action after engaging in the protected conduct; and (3) there was a causal link between the protected conduct and the adverse action." *Laird v. Fairfax Cnty., Virginia*, 978 F.3d 887, 893 n.4 (4th Cir. 2020) (*Laber v. Harvey*, 438 F.3d 404, 432 (4th Cir. 2006)). A request for accommodation is a protected activity under the ADA. *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 577 (4th Cir. 2015). Once the plaintiff establishes a prima facie case of retaliation, "[t]he 'employer then has the burden to rebut the presumption of retaliation by articulating a legitimate nonretaliatory reason for its actions.'"

*Lashley v. Spartanburg Methodist Coll.*, 66 F.4th 168, 174 (4th Cir. 2023) (quoting *Jacobs*, 780 F.3d at 578). "The burden then shifts back to [the plaintiff] to show that the proffered reason is pretext." *Id.* (quoting *Jacobs*, 780 F.3d at 578). "Importantly, [the plaintiff] 'always bears the ultimate burden of persuading the trier of fact that she was the victim of retaliation.'" *Id.* (quoting *Rhoads*, 257 F.3d at 392). The plaintiff must show that the protected conduct was the "but-for" cause of the adverse action. *Staley v. Gruenberg*, 575 F. App'x 153, 156 (4th Cir. 2014).

Here, the record contains no evidence that Plaintiff was discharged because she requested, and was granted, accommodations for her disability. Evidence in the record shows that Plaintiff was discharged for reasons related to insubordination and communication issues with Ms. Lee. There is no evidence that Plaintiff's accommodation requests were a factor in the termination decision. Further, Plaintiff made her initial request for accommodations in April 2018, and the final component of her requested accommodations was implemented no later than August 2018— six months before Plaintiff was terminated. Such a lengthy temporal gap is insufficient to suggest a causal link between Plaintiff's protected activity and her termination. *Lewis v. Baltimore City Bd. of Sch. Comm'rs*, 187 F. Supp. 3d 588, 597 (D. Md. 2016) (six-month lapse too lengthy to show causal connection).

Because Plaintiff fails to present a *prima facie* case of ADA retaliation, Defendants' motion for summary judgment shall be granted as to Count II.

### C. Counts III and IV – MFCA and FCA

In Counts III and IV, Plaintiff alleges that Defendants retaliated against her by terminating her after she engaged in activities protected by the MFCA and FCA. ECF No. 20, ¶¶ 78–103, 104–23.

"The FCA is a statutory scheme designed to discourage fraud against the federal government." *Mann v. Heckler & Koch Def., Inc.*, 630 F.3d 338, 342–43 (4th Cir. 2010), *abrogated on other grounds by United States ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 200–01(4th Cir. 2018). Its "cornerstone provision . . . prohibits any person from presenting 'a false or fraudulent claim for payment or approval' to the United States." *Id.* (citing 31 U.S.C. § 3729(a)). The FCA also contains an anti-retaliation provision in section 3730(h), which provides, in relevant part, a cause of action for "[a]ny employee, contractor, or agent" who "is discharged . . . because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h). A successful retaliation claim under the FCA requires a showing that: "(1) [the plaintiff] engaged in protected activity; (2) [her] employer knew of the protected activity; and (3) [her] employer took adverse action against [her] as a result." *Leverette v. Louis Berger U.S., Inc.*, No. 22-1891, 2024 WL 2355419, at *1 (4th Cir. May 23, 2024) (citing *Glynn v. EDO Corp.*, 710 F.3d 209, 214 (4th Cir. 2013)).

"Under [31 U.S.C.] § 3730(h), protected activity includes acts done 'in furtherance of an FCA action' and 'other efforts to stop 1 or more FCA violations.'" *Id.* (quoting *United Airlines*, 912 F.3d at 200) (quoting 31 U.S.C. § 3730(h))). To qualify as an effort to stop FCA violations, the plaintiff must have held "an objectively reasonable belief that the employer [was] violating, or soon [would] violate, the FCA." *Id.* (quoting *United Airlines*, 912 F.3d at 201) (alterations in *Leverette*). *See also United Airlines*, 912 F.3d at 201 ("We find that the distinct possibility standard does not apply to § 3730(h)'s second prong and adopt the objective reasonableness standard for protected activity under this prong."). Under this standard, "[a] belief is objectively reasonable when the plaintiff alleges facts sufficient to show that [s]he believed h[er] employer was violating

the FCA, that this belief was reasonable, that [s]he took action based on that belief, and that h[er] actions were designed to stop one or more violations of the FCA." *United Airlines*, 912 F.3d at 201–02. "However, while the plaintiff's actions need not 'lead to a viable FCA action' as required under the distinct possibility standard, they must still have a nexus to an FCA violation." *Id.* at 202.

Similar to the FCA, the MFCA prohibits false or fraudulent claims for payment or approval through a Maryland "State health plan" or "State health program." Md. Code Ann., Health Gen. § 2-602(a). The MFCA also contains an anti-retaliation provision that prohibits "retaliatory action" against employees for certain protected activities, including "[d]isclos[ing] or threaten[ing] to disclose to a supervisor or to a public body an activity, policy, or practice . . . that the employee . . . reasonably believes is in violation of § 2-602(a) . . . ;" and "[o]bject[ing] to or refus[ing] to participate in any activity, policy, or practice that the employee . . . reasonably believes is in violation of § 2-602(a) . . . ." Md. Code Ann., Health Gen. § 2-607(a). Judges in this district have looked to FCA case law for guidance when addressing claims brought under the MFCA. *See Simmons v. UM Cap. Region Health, Inc.*, 2022 WL 2065932, at *3 (D. Md. June 8, 2022); *Gharib v. J. of Comm. on Political Econ. of Good Soc'y*, Civ. No. GJH-17-3476, 2018 WL 4679954 (D. Md. Sept. 27, 2018).

Defendants contend that Plaintiff cannot establish that she engaged in a protected activity after receiving the PACU bed-counting assignment from Ms. Lee. The question is whether Plaintiff engaged in efforts to stop potential FCA violations based on an objectively reasonable belief that her employer was violating, or would soon violate, the FCA or MFCA. *See United Airlines*, 912 F.3d at 201–02.

Plaintiff fails to offer evidence sufficient to create a genuine dispute on this issue. First, the record is clear that Plaintiff's inquiry to NHSN by email on December 21, 2018, was not an effort to stop any potential FCA violation. Plaintiff was not alerting NHSN of any false reporting by her employer. She merely posed a question of how data may be reported in compliance with NHSN rules.

Second, even if the inquiry to NHSN could be reasonably viewed as an effort to stop or disclose a potential FCA or MFCA violation, any belief Plaintiff had at the time that her employer would soon violate the FCA or MFCA was not objectively reasonable. The assignment Plaintiff received was merely to collect data—not to falsely report it. And any belief that Ms. Lee or anyone else at UM Capital Region Health would soon report false data would not be objectively reasonable because the data she contends would be falsely reported had not even been collected.

Third, Plaintiff fails to adduce sufficient evidence that Ms. Lee planned to manipulate the data she asked Plaintiff to collect. Ms. Lee testified in her deposition that Plaintiff was instructed only to collect the data and that the data would be used to determine a proper NHSN reporting method. ECF 61-25 at 102:2–105:14, 118:1–4. Ms. Lee did not intend—nor did she ever instruct Plaintiff—to combine the numbers for purposes of reporting to NHSN before a determination could be made as to how the data would be incorporated into NHSN reporting. *Id.* at 105:9–113:15. Ms. Lee's testimony on these points is corroborated by an email she sent Plaintiff on December 28, 2018, stating in part: "Because of that uncertainty of the bed utilization, we need to start collect data to determine further about this[,]" and that "next step[s]" would be determined at a later point. ECF No. 60-26 at 2. Although Plaintiff testified in her deposition that, when she assigned Plaintiff the PACU bed data collection task, Ms. Lee's plan was to add the PACU bed data "into the ICU numbers[,]" there is no evidence to corroborate this self-serving testimony. *See CoStar Realty*

*Info., Inc. v. Field*, 737 F. Supp. 2d 496, 510 (D. Md. 2010) (finding "self-serving deposition testimony" to be "insufficient to create a genuine dispute of material fact on this claim to survive summary judgment"); *Int'l Waste Indus. Corp. v. Cape Env't Mgmt., Inc.*, 988 F. Supp. 2d 542, 558 n.11 (D. Md. 2013), *aff'd*, 588 F. App'x 213 (4th Cir. 2014) (finding certain "self-serving, conclusory, and uncorroborated statements" to be "insufficient to create a genuine issue of material fact"; *Williams v. Lazer Spot, Inc.*, Civ. No. BPG-13-1850, 2014 WL 5365581, at *3 (D. Md. Oct. 21, 2014) ("Without further evidence, self-serving testimony is insufficient to defeat summary judgment.") (citation omitted).

Fourth, any belief Plaintiff held that Ms. Lee intended to manipulate the data she asked Plaintiff to collect could not have been objectively reasonable after their exchange of emails on December 28th. On that date, Plaintiff sent an email to Ms. Lee stating a concern that it may not be "acceptable, from an NHSN perspective, to simply add the PACU-ICU numbers into the main ICU numbers, *as you instructed*." ECF No. 60-26 at 3–4 (emphasis added). Plaintiff further stated her belief that "a virtual location would have to be created [to capture the PACU-ICU beds]."[8] *Id.* at 4. As noted above, Ms. Lee responded to Plaintiff's concerns by stating that the bed utilization data needed to be collected given the "uncertainty" and that further steps would be decided at a later point. *Id.* at 2. Thus, any internal whistleblowing that Plaintiff contends she engaged in after this exchange with Ms. Lee could not have been based on an objectively reasonable belief that Defendants would soon violate the FCA or MFCA.Furthermore, Plaintiff could not have reasonably believed that the PACU bed counting assignment constituted a violation of the MFCA, such that her refusal would constitute a protected activity under Md. Code Ann., Health Gen. § 2-

---

[8] The Court notes that Plaintiff framed this proposition as a mere belief without disclosing that she had already contacted NHSN about this issue and had received a response earlier that day that she took to be confirmation of her belief.

607(b). Plaintiff was merely instructed to collect data—not to submit a false or fraudulent claim for payment or approval from a State health plan or State health program. *See* Md. Code Ann., Health Gen. § 2-602(a).

In sum, because Plaintiff fails to present any genuine issue that she engaged in FCA- or MFCA-protected activity, summary judgment must be granted in Defendants' favor on Counts III and IV.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (ECF No. 60) shall be GRANTED.

A separate Order will follow.

| | |
|---|---|
| 2/13/25 | _____ |
| Date | Matthew J. Maddox<br>United States District Judge |